**SO ORDERED.**

**SIGNED this 04 day of December, 2009.**

_____
**Randy D. Doub
United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
WILSON DIVISION

| | |
|---|---|
| **IN RE:** | **CASE NOS.** |
| | **ADMINISTRATIVELY CONSOLIDATED UNDER CASE NO.** |
| **FOUNTAIN POWERBOAT INDUSTRIES, INC.** | **09-07132-8-RDD** |
| **FOUNTAIN POWERBOATS, INC.** | **09-07133-8-RDD** |
| **FOUNTAIN DEALERS' FACTORY SUPERSTORE, INC.,** | **09-07134-8-RDD** |
| **BAJA BY FOUNTAIN, INC.,** | **09-07135-8-RDD** |
| **DEBTORS** | |

**ORDER DENYING FB INVESTMENTS, LLC'S MOTION TO
TERMINATE EXCLUSIVITY PURSUANT TO 11 U.S.C. § 1121(d)**

Pending before the Court is FB Investment, LLC's Motion to Terminate Exclusivity Pursuant to 11 U.S.C. § 1121(d)(the "Exclusivity Motion") filed by FB Investments, LLC ("FB"), the Objection to the Motion to Terminate Exclusivity (the "Debtors' Objection") filed by Fountain Powerboat Industries, Inc., Fountain Power Boats, Inc., Baja by Fountain, Inc., and Fountain Dealers' Factory Superstore, Inc. (collectively, the "Debtors"), the Response of Liberty Associates, L.C. to FB Investments, LLC's Motion to Terminate Exclusivity (the "Liberty Objection,"

collectively referred to with the Debtors' Objection as the "Objections") filed by Liberty Associates, L.C. ("Liberty"), and the Response of the Official Committee of Unsecured Creditors In Support of Motion by FB Investments, LLC for Separate Hearings on Disclosure Statement and Plan (the "Committee Response")[1] filed by the Official Committee of Unsecured Creditors (the "Committee"). The Court conducted a hearing on December 1, 2009 to consider the Exclusivity Motion and the responses thereto.

## FACTUAL AND PROCEDURAL BACKGROUND

On August 24, 2009 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The Debtors filed several first day motions and applications, including a Motion to Consolidate the cases for administrative convenience,[2] Motion to Permit Use of Cash Collateral, Application to Employ Debtors' Counsel, Application for Approval of Officer Compensation, and Motion related to pre-petition employee payroll and benefit payments. In addition, the Debtors also filed a Motion to (A) Approve Sale of Substantially All Assets of Debtors, (B) Establish Related Sales Procedures, (C) Transfer Any and All Liens, Claims, Encumbrances And Interests of Debtors to Proceeds of Sale, (D) Approve Form and Manner of Notice of Sale, (E) Assume and Assign Certain Leases and Executory Contracts, and (F) Schedule Hearings to Establish Sales Procedures and Confirm Sale (the "Sale Motion"). On September 1, 2009, the Court conducted a hearing in connection with

---

[1] The Committee's Response was filed in connection with the Motion of FB Investments, LLC for Separate Hearings on Disclosure Statement and Plan. However, the pleading addresses the Motion subject to this order as well. Therefore, the Court has considered the relevant portions of this document in reaching its decision.

[2] Pursuant to the Debtors' request, the cases were consolidated for administrative purposes.

several of the first day motions, including the Sale Motion. Regions Bank, N.A. ("Regions"), the Debtors' primary secured lender, appeared at the hearing on the Sale Motion and consented to the proposed sale procedures. Subsequently on September 10, 2009, the Court entered an Order Approving Form and Manner of Notice and Sale Procedures, Setting Deadlines for Bids and Objections, and Scheduling Final Hearing to Confirm Sale (the "Sale Order").

On September 14, 2009, an Order was entered setting December 22, 2009 as the deadline by which the Debtor must file a Chapter 11 Plan of Reorganization and Disclosure Statement.

On September 17, 2009, FB purchased the Regions indebtedness and Regions assigned its right, title, or interest in connection with its loans to FB. FB proceeded to qualify as a qualified bidder (as defined in the Sale Motion) for the proposed auction sale and intended to credit bid at the proposed auction sale. However, subsequent to FB's purchase of Region's indebtedness, the Debtors received a proposal from Liberty, a party also wishing to acquire the Debtors, to allow Liberty to provide post-petition financing that would allow the Debtors to continue operations and to fund a joint plan of reorganization.

On September 30, 2009, the Debtors filed a Motion to Postpone the Proposed Auction Sale scheduled as set by the Sale Order. Without hearing, the Court declined to postpone the auction sale.

An Order Appointing an Official Committee of Unsecured Creditors was entered on October 1, 2009.[3]

---

[3] Counsel for the Official Committee of Unsecured Creditors was employed by Order of this Court entered on November 19, 2009.

Also on October 1, 2009, the Debtors filed a Motion to Approve Post-petition Financing. FB objected to both motions and, in response, filed a Motion to Appoint a Chapter 11 Trustee. The Debtors objected to the appointment of a trustee. FB, who was the only qualified bidder, submitted a credit bid $8.75 million.

On October 9, 2009, the Court conducted a hearing pursuant to the Sale Order to determine whether the auction sale should be approved as well as, the Motion to Approve Post-petition Financing, and the Motion to Appoint a Trustee. After considering the testimony, the evidence presented, and the arguments of counsel, the Court declined to approve the sale, permitted the Debtors to obtain up to $1.5 million in post-petition financing from Liberty to continue its operations, and declined to appoint a trustee. Also at the hearing on October 9, 2009, the Court approved the Debtors use cash collateral pursuant to their proposed budget through December 1, 2009.

On November 4, 2009, FB filed the Exclusivity Motion seeking to terminate the period of exclusivity provided to the Debtors pursuant to 11 U.S.C. § 1121. On November 23, 2009, the Committee filed the Committee Response in support of the Exclusivity Motion. Also on November 23, 2009, the Debtors and Liberty filed their Objections opposing Exclusivity Motion.

On November 24, 2009, the Debtors and Liberty filed a Joint Plan of Reorganization dated November 20, 2009 (the "Proposed Plan") and the Disclosure Statement for Joint Plan of Reorganization Dated November 20, 2009 (the "Disclosure Statement").

## DISCUSSION

Section 1121 of the Bankruptcy Code provides that a Debtor has the exclusive right to file a plan of reorganization during the first 120 days following the entry of an order for relief and 60

4

days thereafter to have filed a plan that has been accepted by each class of claims or interests that is impaired under its plan. The Debtors filed their voluntary petitions on August 24, 2009 and, unless shortened by the Court, the Debtors' exclusivity period to file a plan expires on December 22, 2009 and to solicit acceptances expires on February 20, 2010.

Pursuant to the Exclusivity Motion, FB requests that the Court terminate the exclusivity periods set forth in 11 U.S.C. § 1121(d) and allow FB to file a competing plan of reorganization.[4]

Section 1121(d) provides that these exclusivity periods may be shortened or lengthened for "cause." The determination of whether "cause" exists is an issue of fact and the burden of proof to establish cause lies with the moving party, in this case FB. *In re Texaco, Inc.,* 81 Bankr. 806, 813 (Bankr. S.D.N.Y. 1988).

However, "cause" is not specifically defined in the Bankruptcy Code. The Court has found no Fourth Circuit cases that have considered this issue. However, there are cases outside of this jurisdiction that have considered the issue of cause in making a determination to extend or reduce the exclusivity period for the debtor in possession. *See In re Situation Management Sys., Inc.,* 252 B.R. 859 (Bankr. D. Mass. 2000)(holding that new value provision included in debtor's proposed plan constituted cause to terminate exclusivity)*; In re Express One Int'l., Inc.,* 194 BR 98 (Bankr. E.D. Tx. 1996)(enumerating four factors courts have considered relevant in determining if cause exists to terminate exclusivity); *In re Grand Traverse Development Co. Ltd.,* 147 B.R. 418 (Bankr. W.D. Mich. 1992)(applying the "obstacle to successful reorganization test" to determine whether

---

[4] The Debtors have satisfied the first requirement to maintain exclusivity as they filed the Proposed Plan and Disclosure Statement on November 24, 2009, well within the first 120 days. Therefore, the Court will consider whether or not the second period of 180 days for solicitation of acceptances shall be terminated.

to shorten the initial 180 day exclusivity period for a debtor to obtain acceptances). Whether cause exists is a factual determination that must be considered on a case by case basis.

To assist the court in determining whether or not the facts in this case establish cause, the parties argue that the factors set forth in *In re Express One Int'l., Inc.* should be weighed in light of the facts of this case. 194 BR 98 (Bankr. E.D. Tx. 1996). The court agrees that these nine factors should be considered as part of its analysis of whether cause exists to terminate the Debtors' exclusivity. As such, the Court considers each factor separately:

1. <u>Size and complexity of the case</u>. The Debtors' cases are complex cases consisting of four separate cases which have been consolidated for joint administration. The largest secured creditor, FB is owed approximately $19 million. In addition to FB, there are numerous types of unsecured creditors, including floor plan financiers, dealers, purchasers, trade creditors, and vendors. In addition, the Debtors not only manufacture luxury power boats and fishing boats, but purchased certain assets from Baja Marine Corporation, a division of Brunswick Corp., to allow it to broaden its customer base and build smaller boats based on the former "Baja" molds.

In its corporate history, the Debtors, especially Fountain Powerboats, Inc. ("Fountain"), have built an international company that is engaged in business with customers from around the world. Fountain is well-known and highly regarded throughout the power boat and fishing boat manufacturing industry. In addition to manufacturing boats, Fountain maintains its customer base by servicing boats, completing warranty repairs, and maintaining visibility on the racing circuit. Prior to the downturn in the economy, Fountain stock was traded on the New York Stock Exchange.

Though this case may not be as large and complex of a case as compared to others, the Court notes that this factor typically applies in the situation where a large debtor is requesting that the

exclusivity period be extended based on "the concomitant difficulty in formulating a plan of reorganization." *Express One*, 194 B.R. at 100 (citing *In re Pine Run Trust, Inc.*, 67 B.R. 432, 435 (Bankr. E.D. Pa. 1986). In this case, the Debtor is not requesting an extension. Instead, it is a creditor who seeks to file an competing plan. The complexity and size of this case has not deterred the Debtors in that they have filed their Proposed Plan and Disclosure Statement within 90 days after the Petition Date and well within the exclusivity period.

    2. <u>Necessity of sufficient time to permit debtor to negotiate plan</u>. The Debtors have filed the Proposed Plan and Disclosure Statement. Since the Disclosure Statement has not been approved at this point, the Debtor is unable to solicit acceptances of the Proposed Plan. Furthermore, at the time the Proposed Plan was filed, counsel for the Committee had just been appointed. As such, the Debtors have not had an opportunity to negotiate with the Creditors Committee or creditors regarding the terms of the Proposed Plan.

    3. <u>Existence of good faith progress toward reorganization</u>. FB asserts that the Debtors have not acted in good faith by initially proposing to sell substantially all of the Debtors assets through an auction process and now seek to transfer the Debtors' stock to Liberty through the Proposed Plan. However, at the time the proposed auction sale was presented to the court, there was no distribution to unsecured creditors. The bid by FB was just a credit bid. In acting in the interest of the estate, the Debtors located a post-petition lender, Liberty, who was willing to provide the Debtors with operating capital, to allow the Debtors to resume operations.

    The Debtors' operation in Washington, North Carolina is critical to the local community as they have provided numerous jobs through the years. However, its more than 400 employee workforce had dwindled to 15 employees as of October 9, 2009. Since the hearing on October 9,

2009, the Debtors have increased their payroll to 70; thereby bringing some jobs back to the community. Irving Smith, Chief Operating Officer of the Debtors, testified that the start up after the approval of the post-petition financing was initially slow and that they are approximately 30 days behind on its projections. Based on the evidence presented to the Court, including their ability to generate some new boat sales and maintenance work during the off-season which has resulted in new jobs for the community, the delay in reaching its projections does not rise to the level of a lack of good faith.

    Furthermore, once the Court determined the initial auction sale was not in the best interest of creditors, the Debtors appear to have been diligent in their efforts to propose a reorganization plan. The Proposed Plan, filed well within the exclusivity period, is not an attempt to strong-arm creditors into acceptance and the Debtors have not requested multiple extensions to exclusivity which could possibly force creditor acceptance. In fact, the Debtors filed their Proposed Plan more than thirty days before the expiration of the exclusivity period which shows that there has been no undue delay on the part of the Debtor and that they are not exhibiting any lack of good faith in their attempt to reorganize.

    4. <u>Debtor paying its bills as they become due.</u> Based on the testimony of Irving Smith, the Debtors appear to be paying their bills as they become due with the exception of a delay in the repayment of the post-petition financing loan from Liberty. However, since Liberty opposes the termination of exclusivity, it appears that the delay in payment to it will not hinder its decision to fund the Proposed Plan.

    5. <u>Reasonable prospects for filing a viable plan.</u> The Debtors filed the Proposed Plan on November 20, 2009. Given the fast track nature of this case, the Debtors have not had the

opportunities to negotiate with creditors or other parties-in-interest and there have been no amendments to the Proposed Plan. FB argues that it will attempt to block any plan proposed by the Debtors that does not transfer ownership of the Debtors to FB. However, the Court recognizes the importance of providing the Debtor some breathing room to negotiate with the parties without a competing plan to undermine its efforts. That is not to say that the Court believes the Proposed Plan is or is not viable as filed, but instead considers this factor relevant to the extent that it would allow the Debtors time to negotiate a viable plan.

      6. <u>Progress in negotiations.</u>  Negotiations with FB would appear to be impossible and, quite possibly, fruitless based on the representations of the parties. FB has made it known that it intends to attempt to block confirmation of the Proposed Plan and, if allowed, file its own competing plan to acquire the assets of Debtors. The fact that FB may be the largest secured and unsecured creditor does not automatically allow it to block confirmation of the Proposed Plan. Again, given that this case has only been pending less than 100 days, with more than the first 30 days focused on an auction sale, the Debtors have not been given an opportunity to negotiate with creditors. All parties are aware that FB intends to file a competing plan, either now or upon the termination of exclusivity, but in the meantime, the Debtors should at least have the opportunity to attempt to negotiate terms, to amend the Proposed Plan, if necessary, and to obtain the necessary acceptances.

      Depending on the terms of a plan, it could be confirmed even in the face of a rejection by FB and unsecured creditors, if the requirements of 11 U. S. C. 1129(b) are met.

      7. <u>Amount of time elapsed in the case.</u>  The Debtors have been diligent in their efforts to modify their plan of reorganization from a Section 363 liquidation sale to finding a post-petition lender and filing the Proposed Plan only 88 days after Petition Date. The Court notes that this case

is moving at a pace similar to many of its Small Business Cases which Congress intended to fast-track under the 2005 Amendments to the Bankruptcy Code.

8. <u>Whether the debtor is seeking an extension in order to pressure creditors to submit to the debtor's reorganization plans</u>.  This factor is not relevant as the Debtors are not requesting an extension.

9.  <u>Unresolved contingency exists.</u> This factor is not present here. There are no pending appeals and there appears to be no pending litigation. *See In re Situation Management Systems*, *Inc.,* 252 B.R. 859, 863 (Bankr. D. Mass. 2000)(finding that exclusivity could be terminated based on other factors even where the debtor's plan structure relied on the outcome of an appeal).

In addition to the nine factors enumerated in *Express One*, the Bankruptcy Court in the Northern District of Indiana considered whether a creditor's loss of confidence in a debtor's management is another factor that should be considered to determine if cause existed to modify the exclusivity period. *In re Matter of all Seasons Industries, Inc.*, 121 B.R. 1002 (Bankr. N.D. Ind. 1990).  In this case, FB offered testimony that it was concerned regarding the losses of the Debtors through the years. Even with this concern, FB was still interested in purchasing the Debtors. During the due diligence period prior to the auction, its representatives visited the manufacturing facility and interviewed management staff and certain key employees.  In fact, there was testimony that FB extended an offer to the current chief executive officer, Reginald Fountain, to remain in a management position at a set salary.  Mr. Fountain ultimately rejected the terms of FB's offer.  Had FB and Mr. Fountain agreed to the terms of his retention, FB would most likely own the Debtors today. Though the terms of that arrangement are not relevant, the fact that FB made such an offer

during the due diligence period shows that it must have had some confidence in the Debtors' existing management.

Lastly, courts have considered two factors as examples of "major obstacles of successful reorganization[;]" including, gross mismanagement of the debtor and acrimonious feuding between the debtor's principals. *In re Grand Traverse Development Co. Ltd.*, 147 B.R. 418, 420 (Bankr. W.D. Mich. 1992)(citing *In re Texaco, Inc.*, 81 B.R. 806, 813 (Bankr. S.D.N.Y. 1988). Neither of these factors appear to exist in this case. FB has not alleged gross mismanagement of the estate and based on the record, the Debtors appear to be working towards ramping up its operations. In addition, as was the case in *Grand Traverse*, the principals of the Debtors do not seem to disagree amongst themselves but instead, it is the secured creditor's aggressive litigation position that appears to be in direct conflict with the Debtors proposed plan. 147 B.R. at 419. This conflict does not constitute cause to terminate the exclusivity period as "to hold otherwise would permit litigious creditors to manufacture 'cause' to justify shortening the exclusivity period through their own unilateral negotiations." *Id.* See also *In re Lehigh Valley Professional Sports Club, Inc.*, 2000 Bankr. LEXIS 237 (Bankr. E.D.Pa. March 14, 2000).

In addition to considering the factors that might establish cause, the Court also looks to the legislative history of Section 1121(d). Prior to the adoption of the Bankruptcy Code of 1978, debtors had unlimited exclusivity for filing a plan. With the adoption of the Bankruptcy Code, Congress chose to limit that exclusivity to 120 days, thereby recognizing that Chapter 11 debtors should have some period of time in an environment which would foster the debtor's reorganization and rehabilitation, as well as provide the opportunity for consensual terms of a plan to be negotiated. *In re McLean Industries, Inc.,* 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987). Therefore, granting such

11

a motion to reduce exclusivity "is a serious matter. Such a motion should be granted neither routinely nor cavalierly." *Id*.

Counsel for the Debtors, Liberty, and Mr. Fountain argue that the Debtors should have the right to propose a plan of reorganization, and that exclusive right should be maintained for the Debtors through the first 120 days to permit the filing of a plan and the first 180 days for obtaining acceptances.[5] This section was specifically legislated by Congress and the Court should not without sufficient cause, reduce the time limits based solely on the largest creditor's dissatisfaction with the proposed plan.

Courts have found granting a motion to reduce exclusivity is so serious a matter that the Court has located only two published cases where "cause" has been established to reduce the initial exclusivity periods of 120 and 180 days. *In re Crescent Beach Inn, Inc.,* 22 B.R. 155, 161 (Bankr. D. Me. 1982)(finding that since the 180 period would expire one week after Labor Day, the final week of the summer season for the debtor, and the acrimonious relationship of the principals, shortening the exclusivity period to allow any parties in interest to file a plan was an appropriate measure); *Pickens Industries, Inc. v. Palmer, Palmer and Coffee (In re Texas Extrusion Corp.),* 68 B.R. 712 (N. D. Tex. 1986), aff'd 844 F.2d 1142 (5th Cir. 1988) (finding that reduction of time for the debtor to file a plan was appropriate where there were acrimonious relations between the parties).     FB, argues that as the major secured creditor, holding a lien on virtually all assets of the Debtors, that it can propose a plan which will provide a greater benefit to creditors and propose a plan of long-term operation of the business superior to that of the Debtors. However, FB only

---

[5] Counsel for Mr. Fountain candidly concedes that if the Debtors had failed to timely file their plan and been the beneficiary of several extensions of the exclusivity period, then exclusivity should be terminated.

recently, in September 2009, purchased the indebtedness from Regions. Although, Mr. Isakow, a principal of FB, stated that he has considered investment in a boating manufacturing company, FB has only had a keen interest in the Debtors' operations since August 2009, while the Debtors have been in business approximately 30 years.  FB is comprised of two sophisticated investors and was, or should have been, aware of the risks involved in purchasing the debt instruments from Regions. Based on the auction procedures, FB knew that its credit bid would not automatically result in FB gaining control of the assets of the Debtors without court approval. After consideration of the proposed transaction and the detriment to the estate, the Court determined that the Debtors may have a viable alternative to the sale that could generate a return for unsecured creditors. As such, the Court determined that the Debtors should have the opportunity to proceed with their cases in an attempt to reorganize under the provisions of Chapter 11, including having the opportunity to file a plan and disclosure statement.

A competing plan at this point could be fatal to any reorganization efforts by the Debtors. The Debtors' ability to manufacture and sell its product would be severely impaired and chilled over the next two months if the Court allowed FB to propose a plan of reorganization at this time.  Such ability to operate free from the competition of a competing plan during the original exclusivity periods of 120 and 180 days will allow the Debtors the opportunity to continue selling boats and increasing their operating income. Such increases may be necessary to establish that the Proposed Plan or any amendments thereto are feasible. The Debtors should have the protection of the exclusivity period to give them this chance to reorganize.[6]

---

[6]This ruling does not extend the original deadlines for the solicitation of acceptances. As it stands, the deadline for acceptances is February 20, 2010.

At this time, the Court finds there is no prejudice to FB as it is receiving adequate protection payments as required by the cash collateral order entered by this Court. Furthermore, should exclusivity expire or should the Court later determine based on a motion of the Debtors that an extension of the exclusivity period is not warranted, FB will have its opportunity to present its proposed plan and disclosure statement, but not now. Creditors and other parties-in-interest are not without remedy. They can determine what is in their best interest and object to the Disclosure Statement; object to the Proposed Plan; vote to reject the Proposed Plan, if they choose to do so; or negotiate alternate treatment or terms with the Debtors. However, the Debtors should have their chance to reorganize in a way that management believes will be in the best interest of the Debtors, its estates, the community, and the creditors. And so they shall, at least through February 20, 2010.

Therefore, based on the reasons set forth above and consideration of the factors set forth above, FB has failed to carry its burden of establishing sufficient cause for terminating or reducing the exclusivity periods set forth in Section 1121(d). The Exclusivity Motion is **DENIED.**

**SO ORDERED.**

**END OF DOCUMENT**