**SO ORDERED.**

**SIGNED this 07 day of May, 2010.**

_____
Randy D. Doub
United States Bankruptcy Judge

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
GREENVILLE DIVISION

| IN RE: | CASE NOS. |
|---|---|
| | ADMINISTRATIVELY CONSOLIDATED UNDER CASE NO. |
| **FOUNTAIN POWERBOAT INDUSTRIES, INC.** | 09-07132-8-RDD |
| **FOUNTAIN POWERBOATS, INC.** | 09-07133-8-RDD |
| **FOUNTAIN DEALERS' FACTORY SUPERSTORE, INC.** | 09-07134-8-RDD |
| **BAJA BY FOUNTAIN, INC.** | 09-07135-8-RDD |
| **DEBTORS** | |

### ORDER ALLOWING APPLICATION FOR COMPENSATION OF MICHAEL T. JACOBS AND JACOBS CAPITAL, LLC AS INVESTMENT BANKER

This matter came before the Court on the Application for Compensation of Michael T. Jacobs and Jacobs Capital, LLC as Investment Banker (the "Application") filed January 20, 2010, and the objections thereto filed by Liberty Associates, L.C. ("Liberty") on February 10, 2010 and the Bankruptcy Administrator for the Eastern District of North Carolina filed on February 16, 2010.

A hearing was held on April 28, 2010 in Wilson, North Carolina. At the hearing, Gregory B. Crampton and Kevin L. Sink appeared on behalf of Liberty, C. Scott Kirk appeared on behalf of the Bankruptcy Administrator, and Wayne K. Maiorano and Anna B. Osterhout appeared on behalf of Michael T. Jacobs and Jacobs Capital, LLC ("Jacobs Capital").

## CASE BACKGROUND

1. The Debtors filed petitions for relief under Chapter 11 of the Bankruptcy Code on August 24, 2009. On August 24, 2009 the Debtors filed a number of first day motions, including, but not limited to, an emergency motion to sell substantially all of the Debtors' assets pursuant to Bankruptcy Code § 363 (the "Sale Motion") and a motion to employ Jacobs Capital as the Debtors' investment banker pursuant to § 327 of the Bankruptcy Code (the "Motion to Employ").

2. Attached to the Motion to Employ was the affidavit of Michael T. Jacobs (the "Affidavit"), which provided that Jacobs Capital was disinterested and included a description of the terms of an engagement agreement setting forth the terms of employment and compensation. Attached to the Affidavit was an engagement agreement entered by Jacobs Capital and Fountain Powerboat Industries, Inc., Fountain Powerboats, Inc. and Fountain Dealers' Factory Super Store, Inc. dated May 5, 2009 (the "Engagement Agreement").

3. Regions Bank was the Debtors' primary secured lender at the time the petition was filed, holding a claim in excess of $19,000,000. FB Investments, LLC ("FB") purchased Regions Bank's note for $6,500,000 on September 17, 2009. Prior to the scheduled sale, the Debtors elected not to proceed with the § 363 sale. By ex parte motion the Debtors requested that the sale scheduled for October 5, 2009 be postponed. The Court denied the requested postponement and the Debtors conducted the sale as scheduled. FB credit bid at the October 5, 2009 sale.

4. The Debtors filed a Report of Sale in which they requested that the Court not approve the sale to FB. Rather, as set forth in the Report of Sale, the Debtors sought to pursue a different course of action in which Liberty would assist the Debtors in reorganizing by providing post-petition financing and funding of a plan of reorganization.

5. Following a hearing on October 9, 2009, the Court disallowed the sale to FB and permitted the Debtors to pursue a reorganization with Liberty's assistance. In addition, the Court approved post petition financing provided by Liberty.

6. On October 15, 2009, the Court entered an order allowing the employment of Jacobs Capital as the Debtors' Investment Banker (the "Order to Employ").

7. On November 24, 2009 the Debtors and Liberty jointly, as co-proponents, filed with the Court and submitted to creditors and other parties in interest a disclosure statement (the "Disclosure Statement") and a proposed plan of reorganization. The Disclosure Statement provides in the section entitled "Classification and Treatment of Claims and Interests" an estimate of Jacobs Capital's administrative claim in the amount of $450,000 based upon 5% of a transaction value of $9,000,000 ($8,000,000 to FB Investments and $1,000,000 for allocation among all unsecured creditors). The Court conditionally approved the Disclosure Statement on December 4, 2009.

8. On January 20, 2010 Jacobs Capital filed the Application. In the Application, Jacobs Capital requests compensation in the amount of $375,000 based upon a $7,500,000 Purchase Price.

9. On January 29, 2010 the Debtors and Liberty filed a First Amended Joint Plan of Reorganization (the "Amended Plan"). On February 11, 2010, the Court entered an Order Confirming First Amended Joint Plan of Reorganization (the "Order Confirming Plan").

Based upon the Court's review and consideration of the Application, the Objections filed by Liberty and the Bankruptcy Administrator, the arguments of counsel, legal authority, testimony

provided by Michael Jacobs on behalf of Jacobs Capital, testimony provided on behalf of Liberty by Reggie Fountain and Irving Smith of Debtors and Bill Gates of Liberty, other evidence presented to the Court at the April 28, 2010 hearing, and the entire record in this matter, the Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1.   The Motion to Employ was filed on August 24, 2009.  Attached to the Motion to Employ was the Engagement Agreement, executed by Michael T. Jacobs on behalf of Jacobs Capital and Reggie Fountain ("Fountain") on behalf of Fountain Powerboats Industries, Inc., Fountain Powerboats, Inc. and Fountain Dealers' Factory Super Stores, Inc.

2.   The Engagement Agreement provided that the Debtors will pay Jacobs Capital a Transaction Advisory Fee of 5% of the Purchase Price.  The Purchase Price is defined in the Engagement Agreement as "the sum of all consideration agreed to be paid to the Company or its shareholders or lenders in a Transaction...." "Transaction" is defined in the Engagement Agreement.

3.   The Engagement Agreement expressly anticipated that the Debtors might pursue a Chapter 11 reorganization as evidenced by the definition of Transaction Advisory Fee which provides that a  Transaction may involve "any merger, consolidation, reorganization or other business combination with the Company (regardless of form or structure) . . . ."

4.   By Order entered October 15, 2009, this Court approved the employment of Jacobs Capital pursuant to the terms of the Motion to Employ and the Engagement Agreement.  The Motion to Employ and the Order to Employ both referenced § 327 of the Bankruptcy Code.  Section § 328 was not cited in either the Motion to Employ or in the Order to Employ.  In addition, the Motion to Employ was not served on all creditors and parties in interest as would be required for pre-approval of an employment agreement pursuant to § 328.  Thus, pursuant to the Order to Employ, the Court

approved the Debtors' employment of Jacobs Capital pursuant to § 327.

5. Since Jacobs Capital was employed pursuant to § 327 of the Bankruptcy Code, the Court is required to review the reasonableness of the compensation requested pursuant to § 330(a)(3).

6. Section 330(a)(3) of the Bankruptcy Code provides in pertinent part:

> In determining the amount of reasonable compensation to be awarded to an examiner, trustee under chapter 11, or professional person, the court shall consider the nature, the extent and the value of such services, taking into account all relevant factors, including —
> (A) the time spent on such services;
> (B) the rates charged for such services;
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue or task addressed;
> (E) with respect to a professional person, whether the professional person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
> (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

7. Thus, in assessing the reasonableness of the compensation requested by Jacobs Capital, the Court considered the nature, extent and value of the services Jacobs Capital provided to the Debtors and the estates. In making this assessment, the Court considered the arguments of counsel, legal authority, the testimony of witnesses and other evidence presented to the Court and analyzed the factors set forth in § 330(a)(3) in the following manner:

(a) Michael Jacobs ("Jacobs") testified that he and Jacobs Capital spent a vast amount of time providing Transaction Advisory Services to the Debtors as that term is defined in the Engagement Agreement. Jacobs Capital dealt with the Debtors' primary secured creditor, Regions Bank, and made numerous contacts with potential investors in order to obtain additional capital or

financing for or to negotiate the sale of the Debtors. Jacobs testified that, among other things, Jacobs Capital contacted 138 prospective buyers and that it scheduled 24 meetings, with Jacobs himself attending 23 of those meetings. In addition, Jacobs testified that he spent time taking prospective buyers out to dinner, and attending numerous other engagements in order to pursue offers. Jacobs further testified concerning his dealings with many prospective investors, including spending more than 100 hours working on a potential transaction with Murphy Family Ventures and more than 50 hours working on a potential transaction with another potential investor which included meetings in both Atlanta, Georgia and Washington, North Carolina.

(b) The compensation requested by Jacobs Capital is based upon 5% of the Purchase Price as that term is defined in the Engagement Agreement. The Engagement Agreement did not provide for any minimum compensation related to the Transaction Advisory Services. Both Jacobs and Fountain, President and CEO of the Debtors, testified that Jacobs Capital's compensation, as set forth in the Engagement Agreement, was less than the compensation proposed by the two other investment banking firms that submitted proposals to the Debtors in connection with this matter. For example, McColl Partners proposed a minimum fee of $600,000 with a 6% commission on any amount over $15,000,000, and Brookwood Associates proposed a minimum fee of $400,000. In addition, Jacobs testified that Jacobs Capital's normal fee for a transaction of this size and complexity is 6%. Jacobs testified that Jacobs Capital charged the Debtors only 5% because Jacobs Capital had previously performed unrelated services for the Debtors through which Jacobs gained certain familiarity with the Debtors' business which he would not have to spend time learning in this engagement. In addition, Jacobs indicated that he felt strongly about handling the transaction on behalf of the Debtors.

(c) The services Jacobs Capital provided to the Debtors were necessary to the

administration of, and were beneficial to, the Debtors and the estates at the time the services were rendered toward the completion of the case. The time spent and efforts made by Jacobs Capital were essential and necessary to the result obtained in the case.

(d) The services rendered by Jacobs Capital were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problems, issues or tasks addressed.

(e) Jacobs' Summary of Qualifications, presented as an exhibit at the hearing, reflects that Jacobs has extensive experience in mergers and acquisitions and is experienced in the business of investment banking. Jacobs received his undergraduate degree from the University of North Carolina at Chapel Hill and he received his Masters of Business Administration from Harvard Business School. He is a noted author and has published numerous articles. Jacobs testified that he has worked on other bankruptcy and distressed transactions in the past. Jacobs testified that he runs the firm of Jacobs Capital, LLC which handles approximately three deals per year.

(f) The compensation requested is reasonable based upon the customary compensation charged by comparably skilled practitioners as was evidenced by the testimony of Jacobs and Fountain regarding the fees proposed by McColl Partners and Brookwood Associates. According to the testimony provided, the compensation sought by Jacobs Capital is lower than the minimum fees proposed to the Debtors by McColl Partners and Brookwood Associates with regard to this project and is less than Jacobs Capital would normally charge for a comparable transaction.

8. The Engagement Agreement contemplated that the Debtors' goal was for the Debtors to survive as a reorganized entity and to dispose of debt owed to Regions Bank, to end Regions Bank's threats to repossess collateral or to shut down the business. The Court finds that the goal was achieved and the results of Jacobs Capital's services were successful.

9. Jacobs testified that the Application was based upon the transaction involving FB's purchase of the Regions Bank note because the subsequent transaction between Liberty and FB had not been consummated at the time the Application was submitted to the Court.

10. Subsequent to FB's purchase of the Regions Bank note, the transaction upon which the Application is based, Liberty and the Debtors jointly filed the Amended Plan. The Amended Plan provides for payment of $7,400,000 to satisfy the Debtors' obligations to FB, which was paid from funds provided pursuant to the Amended Plan, of which Liberty and the Debtors were joint proponents.

11. The Court entered the Order Confirming Plan, pursuant to which the Court approved the $7,400,000 payment to FB through the Amended Plan. This payment falls within the Engagement Agreement's definition of Purchase Price and is an appropriate transaction upon which Jacobs Capital's Transaction Advisory Fee could and shall be calculated pursuant to the terms of the Engagement Agreement. As such, the appropriate compensation to be paid Jacobs Capital is $370,000 which is based upon a 5% Transaction Advisory Fee applied to the $7,400,000 Purchase Price as provided in the Engagement Agreement.

## CONCLUSIONS OF LAW

1. This matter is a "core" proceeding within the meaning of 28 U.S.C. §§ 157 and 1334, among other provisions, and this Court has authority to enter this Order pursuant to 11 U.S.C. §§ 105, 327 and 330, among other sections.

2. This Order is a duly entered Order of this Court and is fully enforceable according to its terms under the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") and other applicable law.

3.	Based upon the Court's review and consideration of the Application, the Objections filed by Liberty and the Bankruptcy Administrator, the arguments of counsel, legal authority, testimony and other evidence presented, and the facts and circumstances of this case, the Application should be allowed and compensation to Jacobs Capital in the amount of $370,000 is approved as a reasonable fee pursuant to § 330 of the Bankruptcy Code.

4.	The Application shall be deemed a final fee application.

In view of the foregoing, it THEREFORE IS ORDERED, ADJUDGED AND DECREED that Jacobs Capital's Application is **ALLOWED**, and Jacobs Capital is entitled to compensation in the amount of $370,000.

IT IS FURTHER ORDERED that the allowed compensation to Jacobs Capital in the amount of $370,000 is an allowed administrative claim and shall be paid pursuant to the Amended Plan.

IT IS FURTHER ORDERED that the Application shall be deemed a final fee application, and not an interim application for Jacobs Capital.

**SO ORDERED.**

**END OF DOCUMENT**